# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeremy David Henderson, | No. CV 09-0154-PHX-GMS (LOA) |
| Plaintiff, | |
| vs. | **ORDER** |
| Joseph Arpaio, et al. | |
| Defendants. | |

Plaintiff Jeremy David Henderson filed this civil rights action under 42 U.S.C. § 1983 against City of Mesa Police Officers Frank Hermosillo and John LaFontaine; Joseph Arpaio, Maricopa County Sheriff; and Greg Basye, emergency room employee at Mountain Vista Hospital. (Doc. #12.) Defendants Hermosillo and LaFontaine move for summary judgment. (Doc. #34.) Although the Court issued a Notice pursuant to Rand v. Rowland, 154 F.3d 952, 962 (9th Cir. 1998) (*en banc*), advising Plaintiff of his obligation to respond, Plaintiff filed no response. (Doc. #37.) The motion is ready for ruling.

The Court will grant Defendants' motion and dismiss them from the case.

**I.    Background**

Plaintiff's claims arise out of his arrest on January 28, 2008, by Hermosillo and LaFontaine. The First Amended Complaint alleged that Hermosillo and LaFontaine used excessive force on Plaintiff during his arrest when they sent a K-9 to attack Plaintiff; that Arpaio was deliberately indifferent regarding alleged abuse by K-9 units; and that Basye was

deliberately indifferent in treating Plaintiff's injuries. (Doc. #12.) The Court ordered all Defendants to answer the First Amended Complaint.[1] (Doc. #11.)

Hermosillo and LaFontaine move for summary judgment on the grounds that (1) they did not violate Plaintiff's constitutional rights because they did not use excessive force and (2) they are entitled to qualified immunity. (Doc. #34.)

## II.     Legal Standards

### A.     Summary Judgment

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, which it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party who must demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 250; see Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th Cir. 1995). Rule 56(e) compels the non-moving party to "set out specific facts showing a genuine issue for trial" and not to "rely merely on allegations or denials in its own pleading." Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The opposing party need not establish a material issue of fact

---

[1] The Court subsequently dismissed Arpaio. (Doc. #27.) Bayse has filed a separate Motion for Summary Judgment, which is not yet ready for ruling and which will be addressed in another order. (Doc. #38.)

conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). However, Rule 56(c) mandates the entry of summary judgment against a party who, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial. Celotex, 477 U.S. at 322-23.

When considering a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255. But, if the evidence of the non-moving party is merely colorable or is not significantly probative, summary judgment may be granted. Id. at 249-50.

**B.  Excessive Force**

"'[A]ll claims that law enforcement officers have used excessive force . . . in the course of an arrest . . . should be analyzed under the Fourth Amendment 'reasonableness' standard.'" Forrester v. City of San Diego, 25 F.3d 804, 806 (9th Cir. 1994) (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)). The Fourth Amendment does not prohibit the use of reasonable force. Tatum v. City and County of San Francisco, 441 F.3d 1090, 1095 (9th Cir. 2006). Whether the force was excessive depends on "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397. See also Tatum, 441 F.3d at 1095; Lolli v. County of Orange, 351 F.3d 410, 415 (9th Cir. 2003). The Court must balance the nature and quality of the intrusion against the countervailing governmental interests.

In determining whether an officer acted reasonably under the Fourth Amendment, the

Court considers the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. The court must balance the nature and the quality of the intrusion on the individual's Fourth Amendment interests against the government interests at stake. Id. at 396 (citing Tennessee v. Garner, 471 U.S. 1, 8 (1985)). Whether the amount of force used was reasonable is usually a question of fact for the jury. Barlow v. Ground, 943 F.2d 1132, 1135 (9th 1991). Summary judgment should be granted sparingly. Bell v. City of Seattle, 395 F. Supp.2d 992, 998 (W.D. Wash. 2005).

### III. Motion for Summary Judgment

#### A. Parties' Contentions

##### 1. Defendants

In support of their motion, Defendants submit their Statement of Facts (Doc. #35, (DSOF)); the affidavits of LaFontaine and Hermosillo (id., Exs. 1 and 4); the affidavits of Gordon Leitz and Joe Adams (id., Exs. 2, 3); and the Maricopa County Superior Court Minute Entry for CR2008-106716 (id., Ex. 5.)

Defendants assert that LaFontaine has been assigned to the Police Service Dog (PSD) Unit since 2000. (DSOF ¶ 1.) LaFontaine's PSD is Spike, a Belgian Malanois. (Id. ¶ 2.) LaFontaine and Spike have been a certified K9 team since their completion of the Mesa Police Department Basic Patrol Dog School in September 2007. (Id. ¶ 3.) They have achieved the National Standards of Certification for Patrol Certification from the National Police K9 Association, and to maintain their team certification, they attend six hours of training weekly. (Id. ¶¶ 4-5.)

Defendants contend that PSD's are trained in building, area, and crime scene searches. (Id. ¶ 7.) PSD's are also used for the protection of their handlers, other officers, other persons, and whenever necessary for the accomplishment of law enforcement goals. (Id. ¶ 8.) PSD handlers view their animals primarily as tools to be used for the detection or location of persons or articles, not as weapons. (Id. ¶ 9.)

On January 29, 2008, at approximately 2:08 a.m., Mesa police officers were

dispatched to the area of 9900 E. Diamond Avenue in reference to a home burglary; a witness reported that a man wearing a white knit hat had crawled under a partially open garage door. (Id. ¶¶ 11-12.) The witness also stated that he did not recognize the person or the car he arrived in. (Id. ¶ 13.)

Officer Adams arrived on Diamond from the east, parked his patrol car, and began walking westbound in an attempt to locate the open garage. (Id. ¶¶ 14-15.) He located a vehicle matching the description given by the witness and a garage door at 9920 E. Diamond that was open about six to twelve inches. (Id. ¶¶ 16-17.) As Adams approached the home, the witness whistled at him and made a gesture indicating that he was at the right house. (Id. ¶ 18.) Adams notified dispatch of the updated location and waited for additional units to respond before making contact. (Id. ¶ 19.)

While Adams waited, dispatch ran the license plate of the suspect vehicle and reported that the car was registered to Plaintiff, who was on supervised release for aggravated assault. (Id. ¶¶ 20-21.) Adams then heard a noise coming from the garage and saw an object being placed near the opening; he notified dispatch that someone was inside the garage. (Id. ¶ 22-23.) As additional units arrived and pulled up close to the home, the garage door opened and a man fitting the description given by the witness ran out and around the house to the west and then northbound towards the block wall to the back yard. (Id. ¶¶ 24-25.) Adams pursued on foot until the suspect jumped over the wall; Adams then opened the gate to the backyard and saw that the suspect was not there. (Id. ¶¶ 26-27.) Adams notified dispatch, stated that he did not know the suspect's direction of travel, and requested assistance from the K9 unit. (Id. ¶¶ 28.)

LaFontaine and Spike responded to the request. (Id. ¶ 29.) Hermosillo also responded and provided backup support to the K9 unit. (Ex. 4, Hermosillo Aff. ¶¶ 3-4.) Adams told LaFontaine what had occurred, advised him of the charges against the suspect, the suspect's physical description, and the last place he was seen. (DSOF ¶ 30.) While talking, LaFontaine and Adams noticed a trail of items on the ground between the garage and the block wall the suspect had jumped; one of the items was a 9" folding knife in the full locked

1  open position.  (Id. ¶ 32.)

2  Spike, LaFontaine, and Hermosillo began their search for the suspect; LaFontaine had
3  Spike on a 6′ leash.  (Id. ¶ 36; Hermosillo Aff. ¶ 4.)  Spike began pulling LaFontaine toward
4  the east end of Dolphin Circle and began sniffing the air; LaFontaine could see a perimeter
5  officer's patrol car and flashing lights parked to the east of them on the other side of the
6  block wall and advised Hermosillo that he thought Spike might be alerting to the perimeter
7  officer.  (DSOF ¶¶ 37-38.)

8  While searching residential yards on the north side of Dolphin Circle, Spike stood on
9  his hind legs and sniffed the air on the east side of the back yard located at 9958 E. Dolphin
10 Circle.  (Id. ¶ 41.)  When they went into the back yard, Spike alerted to the presence of
11 human odor in the area of the east fence.  (Id. ¶ 42.)  Because the back yard appeared to be
12 empty of any obstacles or places a grown man could hide, LaFontaine again advised
13 Hermosillo that he thought Spike was probably alerting to the perimeter officer.  (Id. ¶ 43.)
14 Spike then began to sniff the patio area and the sliding glass door.  (Id. ¶ 44.)  LaFontaine
15 saw a barbeque and two nylon chairs on the patio but no person.  (Id. ¶ 45.)   LaFontaine
16 could also see a red nylon chair propped against the stucco wall, but it appeared to have been
17 set that way to protect if from the rain.  (Id. ¶ 46.)  Spike continued to sniff and jump on the
18 block wall and the patio door, and then, to the officers' surprise, Spike made a quick turn to
19 his right and ran under the red nylon chair that was propped against the wall.  (Id. ¶ 47.)  As
20 Spike put his head behind the chair, a white man jumped up and yelled, "Okay, okay, I give
21 up. I give up. Get the dog off."  (Id. ¶ 48.)  The man, identified as Plaintiff, was sitting with
22 his back against the patio wall tucked in a fetal position under the chair.  (Id. ¶ 49.)

23 Spike latched onto Plaintiff's left arm and brought him out from underneath the chair.
24 (Id. ¶ 50.)  Because LaFontaine could not see Plaintiff, LaFontaine was not able to announce
25 their presence before Spike found Plaintiff.  (Id. ¶ 51.)  As soon as Spike had Plaintiff,
26 LaFontaine and Hermosillo yelled "Mesa Police" and ordered Plaintiff to step away from the
27 patio, to show his hands, and to lay down on the ground; Plaintiff complied with the
28 commands.  (Id. ¶¶ 52-53, 55.)  During this time, LaFontaine was holding Spike's leash with

tension and guiding Spike and Plaintiff out into the open. (Id. ¶ 54.) As soon as Plaintiff was on the ground and the officers could see his hands, LaFontaine approached and physically removed Spike from Plaintiff's arm. (Id. ¶ 56.) Hermosillo and another officer then handcuffed Plaintiff and requested that Mesa Fire respond to the scene. (Id. ¶ 57.) Plaintiff's arm was treated by Mesa Fire, and he was transported to Mountain Vista Hospital, where he received ten stitches and steri strips before being released. (Id. ¶ 58.)

Defendants assert that LaFontaine did not encourage or allow Spike to remain on Plaintiff longer than necessary and did not encourage or allow Spike to attack Plaintiff. (Id. ¶ 63.) Allowing Spike to continue attacking would have been contrary to training and dangerous for the other officers and Spike, exposing him to assault by the suspect. (Id. ¶ 64.) PSD handlers are trained not to release a dog until a suspect is handcuffed for the protection of the suspect, the dog, and other officers. (Id. ¶ 65.) In this case, LaFontaine removed Spike as soon as Plaintiff laid down on the ground but before he was handcuffed because he complied immediately with commands and was calm. (Id. ¶ 66.) LaFontaine did not do a "verbal out," or verbally order Spike to release Plaintiff; instead, LaFontaine physically removed Spike by taking hold of his head and mouth. (Id. ¶¶ 67-68.) PSD handlers are trained not to verbally release dogs on the street because it is a hazard to the officers and to anyone else nearby, and the suspect could be bitten again. (Id. ¶ 69.) PSD handlers are also trained not to remove a dog until it is safe to do so. (Id. ¶ 70.) LaFontaine could not remove Spike until Plaintiff was away from the objects on the patio and laying on the ground with his hands exposed and the officers could confirm that he had no weapons. (Id. ¶ 71.) Consistent with training, LaFontaine praised Spike after removing him from Plaintiff. (Id. ¶¶ 72-73.)

Hermosillo did not issue any commands to Spike and did not address the dog in any manner. (Id. ¶ 60.) Hermosillo does not have the training and/or experience to deal with police K9's; Hermosillo watched LaFontaine remove Spike as soon as Plaintiff was secured, which occurred within about a minute of the bite. (Id. ¶ 61-62.)

///

### 2. Plaintiff

As noted, Plaintiff did not respond to the motion. Because a verified complaint may be used as an affidavit opposing summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence, the Court will consider the allegations set forth in Plaintiff's First Amended Complaint. Schroeder v. McDonald, 55 F.3d 454, 460 (9th Cir. 1995). In his First Amended Complaint, Plaintiff alleged that LaFontaine did not give Plaintiff any orders but just sent Spike to attack although Plaintiff did not pose any threat or danger. (Doc. #12 at 3.) Plaintiff immediately surrendered, yelling "I give up." Plaintiff asserted that LaFontaine took no action to stop Spike, allowing Spike to continue the attack, which lasted for several minutes. He alleged that LaFontaine and Hermosillo "watched, encouraged, and emboldened" Spike to inflict damage. (Id.) Plaintiff alleged that LaFontaine ordered Spike to attack by calling him a "good boy," and that the officers cursed and used expletives in a sadistic and cruel manner. (Id. at 3-A.) Plaintiff further alleged that the officers worked Spike into a frenzy and lost control of him, so that when LaFontaine ordered Spike to stop, Spike refused to comply. LaFontaine had to physically remove Spike's teeth from Plaintiff's arm. (Id.)

### C. Analysis

The Court will grant summary judgment to Defendants on the Fourth Amendment claim because Defendants have submitted evidence showing there is no dispute of fact as to the reasonableness of their actions under the circumstances, and Plaintiff fails to establish a dispute of material fact to defeat summary judgment.

As stated, the Fourth Amendment analysis of excessive, non-deadly force requires a court to balance the "nature and quality of the intrusion" on a person's liberty with the "countervailing governmental interests at stake" to determine whether the use of force was objectively reasonable under the circumstances. Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1051, 1056 (9th Cir. 2003), citing Graham, 490 U.S. at 396. The objective-reasonableness inquiry under Graham is a three-step analysis. Miller v. Clark County, 340 F.3d 959, 964 (9th Cir. 2003); see also Bryan v. McPherson, 590 F.3d 767, 772-

81 (9th Cir. 2009). First, the court must evaluate the type and amount of force used. Next, it must assess the importance of the governmental interests at stake by considering the factors set out in Graham—the severity of the crime, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest. Finally, the court must balance the "gravity of the intrusion on the individual against the government's need for the intrusion . . . ." Miller, 340 F.3d at 964. The need for force is at the heart of Graham. Drummond, 343 F.3d at 1057 (citation omitted). Where there is no need for force, any forced used is excessive. Headwaters Forest Def. v. County of Humboldt, 240 F.3d 1185, 1199 (9th Cir. 2000), vacated and remanded on other grounds, County of Humboldt v. Headwaters Forest Def., 534 U.S. 801 (2001).

### 1. Type and Amount of Force

Here, the type and amount of force used was the K9. In Miller, the Ninth Circuit concluded that use of a K9 was a serious intrusion on the plaintiff's Fourth Amendment interest. 340 F.3d at 964. In that case, the evidence showed that the force used was exacerbated by the duration of the dog bite—between 45 and 60 seconds. Id. at 961.

Plaintiff asserts that the bite lasted several minutes. The Court finds that the use of a K9 is a significant level of force that must be justified by "a strong government interest [that] compels the employment of such force." See Deorle v. Rutherford, 272 F.3d 1272, 1280 (9th Cir. 2001).

### 2. Government's Interest—Graham factors

Next, the Court considers the government's countervailing interests, especially in light of the Graham factors. In Miller, the court found that the government has an undeniable legitimate interest in apprehending criminal suspects and that the interest is even stronger when the criminal is suspected of a felony, holding that such a situation strongly favors the government. 340 F.3d at 964. Compare Drummond, 343 F.3d at 1057 ("less-than-overwhelming" government interest where there was no underlying crime at issue—a neighbor called police because the plaintiff was acting in an emotionally disturbed manner; Bryan, 590 F.3d at 777 (traffic violations generally will not support the use of significant

force). Here, it is undisputed that Plaintiff was suspected of a serious crime—residential burglary. This factor weighs in favor of the government.

The most important Graham factor is whether a suspect posed an immediate threat to the safety of the officers or others. Miller, 340 F. 3d at 964; Bryan, 590 F.3d at 775. In Miller, the court held that, from the officer's viewpoint, the plaintiff posed an immediate threat to his safety. 340 F.3d at 965. The court noted that the officer knew Miller had defied orders to stop and that he was a felony suspect. In addition, the officer knew that Miller was hiding in the woods but the officer did not know where, and he did not know if Miller was armed; however, the officer knew that Miller remained defiant because he ignored the officer's warning that he was about to release the police dog. Id. The court found these and other factors to be "objectively menacing" and to entitle the officer to assume that Miller posed an immediate threat to his safety and the safety of others. Id.

Here, the evidence shows that Defendants were called as part of a backup response after Plaintiff fled the scene of a burglary; officers knew Plaintiff had fled on foot but they did not know where he was; it was night, so it was dark; they knew he was on supervised release for aggravated assault; and they knew that he had been carrying at least one weapon. As to Plaintiff's claims that he posed no threat, even assuming that was true, Plaintiff offers no evidence to show that Defendants would know that he was unarmed. Compare Bryan, 590 F. 3d at 775 (plaintiff dressed only in tennis shoes and boxer shorts); Deorle, 272 F.3d at 1281 ("Deorle was wearing no shirt or shoes, only a pair of cut-off jeans shorts. There was nowhere for him to secrete any weapons."). The Court finds that, as in Miller, with the gravity of the risk to the Defendants, this factor weighs heavily in favor of the government as to the use of the K9 for the search.

As to Spike's discovery of Plaintiff and the subsequent events, Defendants offer evidence, which Plaintiff does not dispute, that Defendants did not know that Plaintiff was hiding near them until Spike located Plaintiff under the chair and seized him. Defendants also offer evidence regarding the need not to release Spike from Plaintiff until the situation was under control—that is, until the officers could ascertain that Plaintiff was unarmed. In

this case, that meant moving Plaintiff and Spike away from the objects on the patio and getting Plaintiff onto the ground with his hands exposed. They also offer evidence that they did not lose control of Spike but removed Spike by taking hold of his mouth to protect everyone concerned, including Plaintiff. LaFontaine concedes that he praised Spike but offers evidence that it was done after the seizure as a standard practice. Moreover, the Fourth Amendment does not require that officers use the least amount of force necessary. Mattos v. Agarano, 590 F.3d 1082, 1088-89 (9th Cir. 2010) (citing Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994).) The Court finds that with the gravity of the risk to the officers, this factor weighs heavily in favor of the government.

The third Graham factor—whether Plaintiff was actively resisting flight—also weighs in favor of the government. At the time of the use of force, Plaintiff was still evading arrest by hiding in the dark. See Miller, 340 F.3d at 966-67.

### 3. Balancing the Interests

Finally, the Court holds that the force used was reasonably necessary under the circumstances. The required determination—balancing the force used against the government's interest—"must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97.

Here, the force used was significant, but the government's interests were also great. Although police need not always show that they attempted less forceful means to secure a suspect, such a showing can be relevant to the reasonableness of the force ultimately used. See Miller, 340 F.3d at 966. In Miller the Ninth Circuit reasoned that the officers has used several less intrusive means to apprehend Miller before using the dog: they signaled him with vehicle emergency lights and siren; pursued him in a police car; pursued him on foot; and audibly warned him to surrender or be chased by the dog. Id. The court found that under the circumstances, using the dog was "well suited to the task of safely arresting Miller." Id.

Here, the undisputed evidence shows that officers did not warn Plaintiff about the dog but it is also undisputed that they did not know he was nearby. And Plaintiff fled the scene on foot and then hid. Defendants were ultimately unable to locate Plaintiff without Spike and unable to gain control of Plaintiff until Spike moved Plaintiff away from the patio and Plaintiff was on the ground where officers could determine that Plaintiff was unarmed. An arrest is not complete until the individual's liberty of movement is interrupted and restricted by officers making the arrest. State v. Sanders, 575 P.2d 822, 825 (Ariz. App. 1978). Plaintiff's flight from the scene and officers and his sudden seizure by Spike demonstrate a "tense, uncertain, and rapidly evolving" situation. The Court finds these facts to be far different from those in Bryan, where it was undisputed that the plaintiff was unarmed, leveled no physical or verbal threat against the officer, and was standing, without advancing, fifteen to twenty-five feet away from the officer. 590 F.3d at 777.

Thus, Defendants establish that their conduct was reasonable under the circumstances.

### 4. Qualified Immunity

In Saucier v. Katz, 533 U.S. 194, 201 (2001), the Supreme Court mandated a two-step sequence for resolving a qualified immunity claim: the "constitutional inquiry" and the "qualified immunity inquiry." The "constitutional inquiry" asks whether, when taken in the light most favorable to the non-moving party, the facts alleged show that the official's conduct violated a constitutional right. Id. If so, a court would turn to the "qualified immunity inquiry" and ask if the right was clearly established at the relevant time. Id. at 201-02. If the Plaintiff's allegations do not establish a statutory or constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201. In Pearson v. Callahan, 129 S. Ct. 808, 815-16 (2009), the Supreme Court held that the Saucier procedure is not an inflexible requirement; judges "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id. at 818.

Because Defendants establish the reasonableness of their conduct, the Court need not

consider the remainder of the qualified immunity analysis. The Court will grant Defendants summary judgment on the Fourth Amendment claim and dismiss the claims against LaFontaine and Hermosillo with prejudice.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as Defendants LaFontaine and Hermosillo's Motion for Summary Judgment (Doc. #34).

(2) Defendants LaFontaine and Hermosillo's Motion for Summary Judgment (Doc. #34) is **granted**, and the claims against them are **dismissed with prejudice.**

(3) The remaining claims are those against Defendant Basye.

DATED this 3rd day of May, 2010.

G. Murray Snow
United States District Judge